# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

FILED
CLERK, U.S. DISTRICT COURT

AUG - 4 2015

CENTRAL DISTRICT OF CALIFORNIA
BY                           DEPUTY

IN RE:

ROBERT GWEN and MARILYN
BEVERLY LESLIE

Case No.:  2:15-CV-02111-JAK

APPELLANTS OPENING BRIEF

ROBERT GWEN LESLIE APPELLANT

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

BY FAX

## APPELLANT'S OPENING BRIEF

ROBERT GWEN
LESLIE
744 FILLMORE STREET
SANTA PAULA, CALIFORNIA 93060

Appellants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES CITED                                          i

I.  A MOTION TO DISMISS PURSUANT TO FEDERAL RULES
OF CIVIL PROCEDURE 12(b)(6) SHOULD BE
RARELY GRANTED BY THE COURT                                         1

A. CONSTITUTIONAL REQUIREMENTS OF STANDING                          3

II.  ISSUES ON APPEAL                                               4

III. STATEMNT OF FACTS                                              5

IV.   ARGUMENTS AS TO THE ROLE OF THE TRUSTEE
AND IMMUNITY                                                        7

V. COURTS HAVE RULED THAT A MOTION TO DISMISS
UNDER RULE 12(b) IS DISFAVORED AND
S RARELY GRANTED                                                    11

VI. THE TRIAL COURT ABUSED ITS DISCRETION WHICH
WAS HARMFULL IN THAT THE PROPERTY WAS LOST
ND SOLD AT A DEVALUED AMOUNT                                        12

CONCLUSION                                                          12

**TABLE OF AUTHORITIES**

UNITED STATES SUPREME COURT CASES

Bell Atl. Corp. v. Twombly, 550 U.S. 544 ............................................................ pg. 2

Allen v. Wright, 468 U.S. 737 ............................................................................... pg. 3

Scheuer v. Rhodes, 416 U.S. 232 .......................................................................... pg. 3

Wolf v. Weinstein, 372 U.S. 633, 650 ................................................................... pg. 10

Mosser v. Darrow, 341 U.S. 267 .......................................................................... pg. 10


FEDERAL CASES

Lockyer v. Mi rant Corp. ,  398 F. 3d 1098 ......................................................... pg. 2

In re Hirsh, 72 F.3d 1085, 1091(2d Cir. 1995) ................................................... pg. 3

Parks Sch. of Bus. v. Symington, 51 F.3d 1480 .................................................. pg. 2

Cousins v. Lockyer, 568 F.3d 1063, 1067 (9th Cir. 2009) ................................. pg. 2

S. Christian Leadership Conference v. Supreme Court, 252 F.3d 781 .............. pg. 11

Harris v. Am. Postal Workers Union, 198 F.3d 245 .......................................... pg. 11

Schneider v. California DOC, 151 F.3d 1194 ..................................................... pg. 12

Lone  Star Indus., Inc. v. Horman Family Trust, 960 F.2d 917 ......................... pg. 11

Shearson Lehman Hutton, Inc. v, Wagoner, 944 F.2d 114 ............................... pg. 4

Advanced Health-Care Services, Inc. v. Radford Community Hospital,
910 F.2d 139 ........................................................................................................ pg. 3

Hall v. City of Santa Barbara, 833 F.2d 1270 .................................................. pg. 11

In re Cochise College Park Inc., 703 F.2d 1339 ............................................... pg. 7

Adams v. Bain, 697 F.2d 1213 ........................................................................... pg. 3

In re Health Maintenance Foundation, 680 F.2d 619, 621 (9th Cir.1982) ...... pg. 9

Ford Motor Credit Co. v. Weaver, 680 F.2d 451 .............................................. pg. 10

i

*Sherr v. Winkler*, 552 F.2d 1367 — pg. 10

*Moulded Products, Inc. v. Barry*, 474 F.2d 220 — pg. 10

*In re First Research Corp.*, 457 F.2d 331, 332 (5th Cir.1972) — pg. 9

*Leonard v. Vrooman*, 383 F.2d 556 — pg. 10

Dan v. Studebaker-Packard Corp. (1961, CA 6 Mich.) 288 Fed. 2d 201 — pg. 2

*120 Wall Associates v. Schilling*, 266 F.2d 548, 550 (2d Cir.1959) — pg. 9

*Hudson v. Wylie*, 242 F.2d 435, 447 (9th Cir.1957) — pg. 8

*S. & W. Holding Co. v. Kuriansky*, 317 F.2d 666 — pg. 9

In re Power, 115 F.2d 69 — pg. 11

In re Reinboth, 157 F. 672 — pg. 11

*In re Duncan*, 148 F. 464 — pg. 8

*In re Tele-Tone Radio Corp.*, 133 F.Supp. 739 — pg. 8

*In re Tudor*, 100 F. 796 — pg. 8

## BANKUPRTYC CASES

In re A.R. Baron & Co., 280 B.R. 794 — pg. 3

Hemelt v. Pontier (In re Pontier), 165 B.R. 797 — pg. 3

## CODES and Rules of Court

Federal Rules of Civil Procedure 12(b)(6) — pg. 1

U.S. Const. art. III, § 2, cl. — Pg. 4

Sections 70a(5), of the Bankruptcy Act — pg. 7

11 U.S.C. §§ 110(a)(5) — pg. 8

64a(1) of the Bankruptcy Act — pg. 9

i

1  ROBERT GWEN LESLIE
   744 FILLMORE STREET
2  SANTA PAULA, CALIFORNIA 93060

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              FOR THE CENTRAL DISTRICT

10 IN RE:                          Case No. 2:15-CV-02111-JAK

11 ROBERT GWEN and MARILYN         APPELLANTS OPENING BRIEF
   BEVERLY LESLIE
12

13

14                   **DISCUSSION**
                        **I.**
15 **A MOTION TO DISMISS PURSUANT TO FEDERAL RULES**
   **OF CIVIL PROCEDURE 12(b)(6) SHOULD BE**
16
                **RARELY GRANTED BY THE COURT.**
17

18

19      A Motion to Dismiss for failure to state a cause of action filed by Defendants, Sandra K.

20 McBeth, Wells Fargo Bank N.A., and George Torres-Ramos ("Defendants") was brought to

21 dismiss Mr. Leslie's Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6).  Rule

22 12(b)(6) provides that a complaint may be dismissed for "…failure to state a claim upon which

23 relief can e granted, …"

24      The Bankruptcy Court granted said motion and the case was dismissed and this is an

25 appeal from that decision.

26

27      As a general rule, motions to dismiss because of failure to state claim upon which relief

28 can be granted are not favored, and should be granted sparingly and with caution only when it

1    appears to certainty that no set of facts could be proven at trial which would entitle Plaintiff to any

2    relief.   Dan v. Studebaker-Packard Corp. (1961, CA 6 Mich.) 288 Fed. 2d 201.

3          Plaintiff, Robert Gwen Leslie, ("Plaintiff") herein submits his Opposition to the

4    Motion to Dismiss for failure to state a cause of action filed by Defendants, Sandra K. McBeth,

5    Wells Fargo Bank N.A., and George Torres-Ramos ("Defendants").

6

7          A motion to dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims

8    alleged.  See Parks Sch. of Bus. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995).

9          In considering such a motion, a court must take all allegations of material fact as true and

10   construe them in the light most favorable to the nonmoving party, it is also true that "conclusory

11   allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal."

12         And while "a complaint need not contain detailed factual allegations . . . it must plead

13   enough facts to state a claim to relief that is plausible on its face." Cousins v. Lockyer, 568 F.3d

14   1063, 1067 (9th Cir. 2009).

15

16         And the United States Supreme Court recently stated that, "A claim has facial plausibility

17   when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

18   the defendant is liable for the misconduct alleged." Bell Atl.  Corp. v. Twombly, 550 U.S. 544,556

19   (2007).

20         In Bell Atl. Corp. v. Twombly, the Court also stated that Dismissal of a complaint

21   pursuant to Federal Rule of Civil Procedure 12(b)(6) is appropriate only when the complaint does

22   not give a defendant fair notice of a legally cognizable claim and the basis on which it rests. *Bell*

23   *Atl.* Corp. v. Twombly supra at 555.

24

25         The U.S. Supreme Court stated: "The issue is not whether a plaintiff will ultimately prevail

26

27

28

1   but whether the claimant is entitled to offer evidence in support of the claims. Indeed it may

2   appear on the face of the pleadings that a recovery is very remote and unlikely, but that is not the

3   test." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

4       The Ninth Circuit Court, now apply certain requirements that allow trustees to protect

5   themselves and gain judicial immunity.  Those requirements were not met in the claim stated in

6   this complaint.  Those requirements include: (1) giving notice to the debtor and obtaining prior

7   court approval of the proposed act, and (2) providing candid disclosure to the court in furtherance

8   of the requested approval.

9

10      The standard applicable to a motion to dismiss is well established. When ruling on a Rule

11  12(b)(6) motion, the court accepts as true all well-pleaded allegations in the complaint, including

12  all reasonable inferences that may be drawn from them, in the light most favorable to the plaintiff.

13  Hemelt v. Pontier (In re Pontier), 165 B.R. 797, 798-99 (Bankr. D. Md. 1994). "[A] complaint

14  should not be dismissed merely because the court doubts that the plaintiff will ultimately prevail;

15  so long as a plaintiff colorable states facts which, if proven, would entitle him to relief, the motion

16  to dismiss should not be granted." Advanced Health-Care Services, Inc. v. Radford Community

17  Hospital, 910 F.2d 139, 145 n.8 (4th Cir. 1990); Adams v. Bain, 697 F.2d 1213, 1216 (4th Cir.

18  1982).

19

20

21                                  **A.**
                    **CONSTITUTIONAL REQUIREMENTS OF STANDING**

22      Article III of the Constitution confers upon the federal courts the judicial power to

23  adjudicate cases or controversies. U.S. Const. art. III, § 2, cl. 1; Allen v. Wright, 468 U.S. 737,

24  750, 104 S. Ct. 3315, 3324, 82 L. Ed. 2d 556 (1984); In re A.R. Baron & Co., 280 B.R. 794, 799

25  (Bankr. S.D.N.Y. 2002). The Article III doctrine requires that a litigant have standing to invoke

26  the power of a Federal court. Allen, 468 U.S. at 740, 104 S.Ct. at 3324, 83 L.Ed 2d 556; In re

27  Hirsh, 72 F.3d 1085, 1091(2d Cir. 1995).

28

1    In order to have standing, "[a] party must 'assert his own legal rights and interest, and

2    cannot rest his claim to relief on the legal rights or interest of third

3    parties.'" Shearson Lehman Hutton, Inc. v, Wagoner, 944 F.2d 114, 118 (2d Cir. 1991) (quoting

4    Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L. Ed. 2d 343 (1975)).

5    
6            Unless the party has a "personal stake in the outcome of the controversy, the action does

7    not meet the case or controversy requirement of the constitution." Warth, 422 U.S. at 498-99, 95

8    S. Ct. at 2205, 45 L. Ed. 2d 343 (quoting Baker v. Carr, 369 U.S. 186, 204, 82 S. Ct. 691, 703, 7

9    L. Ed. 2d 663 (1962)). Accordingly, a plaintiff must "[1] allege personal injury [2] fairly traceable

10   to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested

11   relief." In re Hirsh, 72 F.3d at 1090 (quoting Allen, 468 U.S. at 751, 104 S.Ct. at 3324, 82 L.Ed.

12   2d 556))(internal citations omitted).

13
14           Here, the plaintiff did have proper standing as the plaintiffs were injured when the

15   property valued in reality for a much higher amount, had certain evidence and land

16   contracts been taken into consideration were damaged when said property was sold for

17   significantly less.  The actions are traceable to the negligence and neglect and action of the

18   trustee and its attorneys outside of the Orders of the Court, which were unlawful conduct,

19   
20   and were likely to be redressed by the complaints requested relief.

21                                                     II.

22                                          ISSUES ON APPEAL

23
24           The appellant believes and argues herein that the bankruptcy court's analysis of the

25   complex transactions involved in this case may have led to improper conclusions about the

26   ownership of the payments received on the land sale contracts and that it applied incorrect legal

27   standards in evaluating the trustee's alleged misconduct. We ask that this Court reverse and

28   remand for further proceedings.

# III.

# STATEMENT OF FACTS

On November 22, 2011, the Trustee filed a "motion for authority to continue operating business of Debtor for limited period." The Trustee sought specific authority to *"enter into [a] certain Well Site, Water Rights and Easement Agreement,* hereinafter referred to as the "Wells Fargo Agreement.") The Trustee's Motion attached as an exhibit the Wells Fargo Agreement, which references a prior well site agreement entered into between the Debtor and Wheeler Canyon Partners LLC dated April 13, 2007. However, the Trustee did not provide the Court with a copy of the April 13, 2007 agreement. Further, the trustee's motion omits key and critical facts, which should have been provided to the Court.

In connection with the 11/22/11 Motion, the Trustee failed to inform the Court and the Debtor of several key points of information. If the Trustee had notified the Court and Debtor of the information, then Debtor allege and believe that the Court would not have granted Trustee's motion.

The Trustee failed to disclose to the Court that the *Well Site, Water Rights and Easement Agreement* was actually drafted by Wells Fargo, N.A., and provided to the Trustee by Wells Fargo, N.A. Further, the Agreement solely benefits Wells Fargo, N.A. (aka ATC Realty Nine, Inc.). It does nothing whatsoever to benefit the Debtor or the bankruptcy estate.

The Trustee failed to disclose to the Court that the *Well Site, Water Rights and Easement Agreement* was not negotiated, and granted extensive value, rights and privileges to Wells Fargo, N.A., and in exchange, the property and estate of the Debtor was devalued, and they received nothing in exchange.

1  The Trustee failed to disclose to the Court that the Wells Fargo agreement provided <u>no</u>
2  <u>benefit</u> to the Debtor/Plaintiff or the estate. The new agreement limits water privileges to the
3  Plaintiff, not to run with the land, and thus adds absolutely no value to the real property.

4  Further, when the motion was filed and the new agreement submitted to the Court, both the
5  Trustee and ATC Realty Nine Inc. knew or believed that water at lift cost was absolutely no
6  benefit to Debtor/Plaintiff as the Trustee intended to sell the real property forthwith. Further, the
7  Wells Fargo agreement provided no benefit to Debtor/Plaintiff because they already have water on
8  the land.
9

10  The Trustee also failed to inform the Court that the owner of the contiguous real property
11  benefited by the Wells Fargo agreement had already drilled 2 separate wells, and installed
12  pumping equipment and lines, and as of the date the Trustee filed the motion, the date the motion
13  was heard, the date ATC Realty Nine Inc. bought the contiguous real property, and the date the
14  new agreement was signed, Wheeler Canyon Partners LLC had abandoned the project, and thus by
15  operation of law, the wells and equipment all became property of the Debtor/Plaintiff/Estate. It is
16  believed and alleged that the value of these wells and equipment is in excess of one million five
17  hundred thousand dollars.
18

19  Thus, when the Trustee signed the new Wells Fargo agreement, not only was there no
20  benefit to the Debtor/Plaintiff/Estate, or no need for the agreement since the property already has
21  water, but the Trustee gave away at least 1.5 million dollars in equipment and drilled wells that
22  belonged to the Debtor/Plaintiff/Estate by operation of law.
23

24  On receiving the duties of Trustee of the debtor's estate, the estate was valued at
25  $36,000,000. There was more than enough assets to satisfy the alleged debt to the IRS, pay the
26  Trustee for her trouble, and leave the Leslie's, who are in their 80's, an adequate amount of money
27  to start their lives over again.
28

1   The trustee actually had an opportunity to perform a great service to the creditors and the
2   debtors had she had the competency and integrity to do so.  As of this date, after liquidating the
3   entire Leslie estate, by her own admission, the trustee has collected approximately $7 mil.  That
4   calculates to be less than 2% of the value of the estate.  The trustee must be held accountable for
5   her breach of fiduciary duties and the result of the estates inability to satisfy the creditor.

6
7                                        **IV.**

8        **ARGUMENTS AS TO THE ROLE OF THE TRUSTEE AND IMMUNITY**

9        The Second Circuit Court found that "a trustee in bankruptcy may be held personally liable
10  for [a] breach of his fiduciary duties" and that "[s]uch liability may attach as the result of
11  negligent, as well as knowing or intentional breaches.".  In *re Gorski* and *re Cochise College*
12  *Park Inc.,* 703 F.2d 1339 (1983).

13
14       In *re Mailman,* the First Circuit Court found that there was "simply no principled way
15  after *Moser* to avoid the conclusion that a bankruptcy trustee can be personally liable for negligent
16  breach of fiduciary duty."

17       Furthermore, in the attempt the trustee has made to invoke immunity by "Acting Pursuant
18  to a Prior Court Order," the Ninth Circuit now apply certain requirements that allow trustees to
19  protect themselves and gain judicial immunity.  One of those requirements being, "providing
20  candid disclosure to the court in furtherance of the requested approval."  Here in the instance case,
21  the invocation of immunity is only when the trustee is acting under the Courts order and within the
22  Courts order.
23

24       Sections 70a(5), of the Act provide that a reorganization or bankruptcy trustee is vested by
25  operation of law as of the date of filing with title to all "property ... which prior to the filing of the
26  petition [the bankrupt] could by any means have transferred, or which might have been levied
27  upon and sold under judicial process against him, or otherwise seized, impounded, or
28

1   sequestered." 11 U.S.C. §§ 110(a)(5), 586 (1976).

2        Such property includes cash and the like possessed by the bankrupt on the date of filing,

3   whether held by the bankrupt himself, *e.g., In re Tudor,* 100 F. 796, 797 (D.Colo.1900) (money),

4   or by an agent on the bankrupt's behalf, *e.g., In re Tele-Tone Radio Corp.,* 133 F.Supp. 739, 744

5   (D.N.J.1955) (bank account).

6        When the bankruptcy herein was filed, the trustee was vested with title to all cash held by

7   the Leslies, and on its behalf.   Property passing to the trustee under section 70a(5) also includes

8   executed contracts between the bankrupt and third parties and any proceeds or right to proceeds

9   still due. *E.g., Hudson v. Wylie,* 242 F.2d 435, 447 (9th Cir.1957) (contract right to collect money

10  based on performance of services by bankrupt that were completed before filing); *In re Hannan,*

11  127 F.2d 894, 897 (7th Cir.1942) (contract right to receive commissions for services of bankrupt

12  rendered prior to filing); *In re Duncan,* 148 F. 464, 469 (D.S.C.1906) (promissory note of

13  bankrupt's employer based on services of bankrupt rendered prior to filing).

14

15        As such the water contracts, and any contracts that added value to the property of the

16  debtors also were included as passing to the trustee for the benefit of debtors and creditors.

17  However, here the trustee, did not investigate, did not allocate, and did not even proceed as to the

18  water rights and contracts hereunder, and instead joined in the motions to dismiss with Wells

19  Fargo the third party that the contract was to have the underlying case dismissed.

20

21        When as here the trustee is not acting in accordance with the Courts order and are

22  negligence and does not earmark and intentionally breaches its duties, that takes the matter out of

23  the immunity.   The deposition transcript of said trustee answers to the majority of the questioning

24  by the attorney for Mr. Leslie as "I don't know".

25

26        The treatment of executory contracts is supported by the well-settled principles governing

27  treatment of creditors of a bankrupt who confer benefit on the bankrupt estate after the date of

28

filing of a bankruptcy petition. Where the consideration supporting the claimant's right to payment is both supplied to and beneficial to the trustee in the operation of the bankrupt's post-filing business, the consideration becomes property of the estate but the right to payment is accorded first priority under section 64a(1) of the Bankruptcy Act. *See* 4A J. Moore & L. King, *Collier on Bankruptcy* ¶ 70.43, at 524 (14th ed. 1978); *cf. In re Health Maintenance Foundation,* 680 F.2d 619, 621 (9th Cir.1982) (denying priority to severance pay claims based on consideration that was neither supplied to nor beneficial to trustee, since services of claimant had been provided to bankrupt prior to bankruptcy); *120 Wall Associates v. Schilling,* 266 F.2d 548, 550 (2d Cir.1959) (denying claim for rent where trustee made no use of leasehold).

This rule is commonly applied in the situation arising when the trustee of a bankrupt lessee continues in possession of the leasehold during the period between the effective date of rejection and the date of the actual act of rejection of the lease. *See generally Palmer,* 104 F.2d at 162-63 (2d Cir.), *cert. denied,* 308 U.S. 590, 60 S.Ct. 120, 84 L.Ed. 494 (1939); 6 J. Moore & L. King, *Collier on Bankruptcy* ¶ 3.23[6.1], at 590-93 (14th ed. 1978).

During the period between initial filing under the Act and the rejection of the lease, the trustee is not required to pay or to set aside in trust the rent due neither under the lease nor to refrain from using the leasehold for the benefit of the estate. *See Palmer,* 104 F.2d at 163; 4A J. Moore & L. King, *Collier on Bankruptcy* ¶ 70.44[4], at 550-52 (14th ed. 1978).

The lessor obtains, however, a claim with administrative expense priority in the amount of the reasonable value of the leasehold used during the interim period by the trustee for the benefit of the estate.*S. & W. Holding Co. v. Kuriansky,* 317 F.2d 666, 667-68 (2d Cir.1963); *see In re First Research Corp.,* 457 F.2d 331, 332 (5th Cir.1972). This special administrative expense priority maintains parity among all of the creditors of an estate who confer benefits on the estate after the date of filing.

1   If a lessor, or for that matter any individual, who confers economic benefit on a

2   bankrupt estate, were not given such a priority, it is likely he would refuse to confer such

3   benefits and would thereby jeopardize the orderly reorganization or administration of the

4   estate.

5

6   A bankruptcy or reorganization trustee is a fiduciary of each creditor of the estate,

7   including anyone who is a party to an executory contract with the bankrupt. *See Wolf v. Weinstein,*

8   372 U.S. 633, 650, 83 S.Ct. 969, 979, 10 L.Ed.2d 33 (1963); *Ford Motor Credit Co. v. Weaver,*

9   680 F.2d 451, 461 (6th Cir.1982); *Sherr v. Winkler,* 552 F.2d 1367, 1374 (10th Cir.1977);

10  *Moulded Products, Inc. v. Barry,* 474 F.2d 220, 224 (8th Cir.), *cert. denied,* 412 U.S. 940, 93 S.Ct.

11  2779, 37 L.Ed.2d 400 (1973).

12

13  As such, he has a duty to treat all creditors fairly and to exercise that measure of care and

14  diligence that an ordinarily prudent person under similar circumstances would exercise. *Weaver,*

15  680 F.2d at 461; *Sherr,* 552 F.2d 1374; *In re Johnson,* 518 F.2d 246, 251 (10th Cir.), *cert. denied,*

16  423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975). Although a trustee is not liable in any manner

17  for mistakes in judgment where discretion is allowed, *Mosser v. Darrow,* 341 U.S. 267, 273-74,

18  71 S.Ct. 680, 683, 95 L.Ed. 927 (1951); *Weaver,* 680 F.2d at 461; *Sherr,* 552 F.2d at 1375, he is

19  subject to personal liability for not only intentional but also negligent violations of duties imposed

20  upon him by law, *see Mosser,* 341 U.S. at 272, 274, 71 S.Ct. at 682, 683; *Johnson,* 518 F.2d 246,

21  251; *cf. Leonard v. Vrooman,* 383 F.2d 556, 561 (9th Cir.1967) (trustee is personally liable for

22

23  acts which either are not taken in good faith or are unreasonable).

24  See attached FBI report as to the intentional and negligent violations of duties imposed and

25  issues that this particular trustee did.  Further based upon the case law herein, the trustee cannot

26  hide under the Order of the Court, when negligent violations of duties were done as noted in

27  Mosser above, and Under Johnson, and Vrooman.

28

1      The receiver-trustee is charged by the Bankruptcy Act with gathering assets of the

2 bankrupt, and that his failure to act diligently in this respect could result in a claim against him. In

3 re Reinboth, 157 F. 672 (2d Cir. 1907); In re Power, 115 F.2d 69 (7th Cir. 1940). Yet this

4 diligence in this case was misdirected and should have been exercised in ways other than by

5 forcible entry and retention of possession and without proper earmarking.

6

7      Further here there should have not been any interest charged to the monthly assets in the

8 account of the debtor which was done in this case costing the debtor thousands of dollars in

9 interest fees monthly.

10                          V.

11 **COURTS HAVE RULED THAT A MOTION TO DISMISS UNDER RULE 12(b) IS**

12 **DISFAVORED AND IS RARELY GRANTED**

13      Numerous Appellate Courts have ruled that a Motion to Dismiss under Rule 12(b) is

14 disfavored and is rarely granted.

15

16      Hall v. City of Santa Barbara, 833 F.2d 1270, 1274 (9th Cir. 1986). ("It is axiomatic that

17 '[the motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted.'")

18 (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure  1357, at 598.

19      A motion to dismiss under Rule 12(b)(6) is disfavored and rarely granted. Harris v. Am.

20 Postal Workers Union, 198 F.3d 245 (6th Cir. 1999) (unpublished) (citing Conley, 355 U.S. at 45-

21 46); see also S. Christian Leadership Conference v. Supreme Court, 252 F.3d 781, 786 (5th Cir.

22 2001) (stating that dismissals for failure to state a claim under Rule 12(b)(6) are disfavored); Lone

23

24 Star Indus., Inc. v. Horman Family Trust, 960 F.2d 917, 920 (10th Cir. 1992) ("A motion to

25 dismiss for failure to state a claim is viewed with disfavor, and is rarely granted.") (internal

26 quotations omitted); Hall v. City of Santa Barbara, 833 F.2d 1270, 1274 (9th Cir. 1986). ("It is

27 axiomatic that '[t]he motion to dismiss for failure to state a claim is viewed with disfavor and is

28

1  rarely granted.'") (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice &

2  Procedure 1357, at 598.

3                                              VI.

4  <u>THE TRIAL COURT ABUSED ITS DISCRETION WHICH WAS HARMFULL IN
   THAT THE PROPERTY WAS LOST AND SOLD AT A DEVALUED AMOUNT</u>

5

6

7          The Ninth Circuit has ruled that the dismissal of a complaint without leave to amend is

8  improper unless it is clear that the complaint could not be saved by any amendment.

9          Dismissal without leave to amend is improper unless it is clear, upon de novo review, that

10 the complaint could not be saved by any amendment." <u>Schneider v. California DOC,</u> 151 F.3d

11 1194, 1196 (9th Cir. 1998).

12         "Amendment should be refused only if it appears to a certainty that plaintiff cannot state a

13 claim." <u>Wright and Miller</u>, Federal Practice and Procedure, vol 5A, 1357. Here an amendment

14
   must surely have been granted to allow and this alone is an abuse of discretion.
15

16 Further a valuation and evidentiary hearing should have been granted to see the valuation of the

17 property when at one point in time the property had offers for purchase of more than $20 million,

18 and there was no rush to sell the property aside from payment of the trustee and its own trustee

19 attorney's fees.

20         The IRS that had a lien on the property was in negotiations to settle with the debtors for a

21 fraction of its lien, towards $ 1 million dollars, however, the actions of the Trustee, and the Abuse

22
   of discretion by the Court had the property sold in a de-valued amount. See the offer and
23
   settlement documents that were submitted to the IRS and in negotiations therein.
24

25
                                        <u>CONCLUSION</u>
26
           Appellant respectively ask this Reviewing Court to review the ruling of the trial court as to
27
   the motion to dismiss, and find that the bankruptcy trial courts decision was in error. The Motion
28

1   to Dismiss, which the District court granted must be reversed and remanded so that all the issues

2   will be tried on the merits.

3           This is a case that the trier of fact must hear and decide, as there are material issues of fact

4   that are in controversy.

5

6   Dated: July 31, 2015

7                                                    Robert Gwen Leslie

ROBERT GWEN LESLIE
744 FILLMORE STREET
SANTA PAULA, CALIFORNIA 93060

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT

IN RE:

ROBERT GWEN and MARILYN
BEVERLY LESLIE

Case No. 2:15-CV-02111-JAK

CERTIFICATION AS TO WORD
COUNT

The Undersigned certifies that the motion filed has a word count of 3830 words,

using Word 2007 or greater.

Dated:  July 31, 2015

Robert Gwen Leslie

# Exhibit A

Recording Requested by: DPS

RECORDING REQUESTED BY
FIRST AMERICAN TITLE COMPANY
NATIONAL COMMERCIAL SERVICES
COMMERCIAL/INDUSTRIAL DIVISION

DB-100-156

**RECORDING REQUESTED BY**
**AND WHEN RECORDED MAIL TO:**

Manatt, Phelps & Phillips, LLP
Attn. Timi Anyon Hallem
11355 W. Olympic Boulevard
Los Angeles, CA 90064

20120203-00018320-0 1/42
Ventura County Clerk and Recorder
MARK A. LUNN
02/03/2012 08:00:00 AM
505141 $138.00 AR

WELL SITE, WATER RIGHTS AND EASEMENT AGREEMENT

THIS INSTRUMENT FILED FOR RECORD BY
FIRST AMERICAN TITLE COMPANY AS AN ACCOMMODATION
ONLY IT HAS NOT BEEN EXAMINED AS TO ITS EXECUTION
OR AS TO ITS EFFECT UPON THE TITLE

## Well Site, Water Rights and Easement Agreement

This Well Site, Water Rights and Easement Agreement ("**Agreement**") is made and entered into and binding and effective as of _January 11_, 20_12_ by and between Sandra McBeth as Chapter 7 Trustee in Case Number 9:08-BK-11949 ("**Leslie**"), the owner of the real property described on **Exhibit A** hereto (the "**Servient Tenement**") and ATC Realty Nine, Inc. ("**ATC**"), the owner of the real property described on **Exhibit B** hereto (the "**Dominant Parcel**").

### RECITALS

A.    Whereas, Robert G. Leslie and Marilyn Leslie, as owners of the Servient Tenement, and Wheeler Canyon Partners, LLC, as owner of the Dominant Parcel, entered into that certain Well Site Agreement dated April 13, 2007 (the "**Existing Agreement**") pursuant to which the Servient Tenement was made subject to easements for water well, access and other purposes and in return was the beneficiary of certain water rights and rights to future income, if any, from the creation of a water company to extract and distribute water from the Servient Tenement; and

B.    Whereas, the Existing Agreement provides in numerous places, including, without limitation, Paragraph 10 of the Existing Agreement, that the Existing Agreement shall run with the Servient Tenement and the Dominant Parcel; and

C.    Whereas, the Existing Agreement provides that certain easements will be drafted and recorded reflecting the provisions of the Existing Agreement and that the parties to the Existing Agreement will promptly cooperate in executing such easements and any other documents which are to be recorded; and

D.    Whereas, this Agreement is a recordable document which incorporates the provisions of the Existing Agreement and sets forth the various rights and obligations of the parties thereto and the easements set forth in and contemplated by the Existing Agreement;

**NOW, THEREFORE**, the parties hereto (each a "**Party**" and collectively, the "**Parties**") hereby agree that the Servient Tenement will be held, transferred, encumbered, used, sold, conveyed, leased and occupied subject to the easements, conditions, covenants, conditions and restrictions set forth herein expressly for the benefit of the Dominant Parcel and of each and every person or entity who now or in the future owns any portion or portions of the same, and that the Dominant Parcel and the Servient Tenement shall be subject to the agreements and covenants set forth herein.

300685568.3                                              1

AGREEMENT

1.      **Grant of Easements.**

1.1     Permanent Water Well Site and Water Easements.  Leslie hereby grants, conveys, and transfers to ATC, as owner of, and for the benefit of,  the Dominant Parcel,  (i) a perpetual and permanent easement to construct, operate, maintain, repair, improve, and replace, three (3) water wells (each a "Water Well" and, collectively, the "Water Wells") in the locations on the Servient Tenement shown and described on Exhibit C hereto (each, a "Well Site" and, collectively, the "Well Sites"), and (ii) the right to extract and use, for domestic and agricultural purposes and for sale to third parties, water therefrom.   Each easement shall include the right to all water produced from each Water Well, subject only to the provisions of Section 1.9 and Article 3 hereof.  The easements granted herein shall include the Well Sites themselves and a rectangular area fifty (50) feet wide by fifty (50) feet long around each of the Well Sites (such area to be measured as if the Well Site were located in the approximate center of such rectangle).  Said rectangular area around each Well Site shall be enclosed with a chain link fence. The approximate location of each of said three (3) rectangular areas is shown on Exhibit D hereto.

1.2     Temporary  Construction and Repair Easement.  As required by the owner of the Dominant Tenement from time to time to construct, repair, replace, maintain or operate the Well Sites and the Water Wells located thereon,  Leslie hereby grants, conveys and transfers to ATC, as owner of, and for the benefit of, the Dominant Parcel an additional easement consisting of the right to use as needed for construction, access, staging and any similar purposes a rectangular area one hundred (100) feet long by one hundred (100) feet wide around each of the Well Sites (such area to be measured as if the Well Site were located in the approximate center of such rectangle).   The approximate area of each of said three (3) rectangular areas is shown on Exhibit E hereto.

1.3     Character of Water Rights and Easements.   The water rights and easements granted herein are permanent and perpetual and appurtenant to the Dominant Tenement.  Such water  rights and easements are exclusive to the owner of the Dominant Tenement except as provided in  Section 1.9 and Article 3  hereof.

1.4     Specific Description of Water Rights and Related Easements.   The water rights and other easements granted herein are as follows:

(a)     Water Well and Water Rights.  The right, subject to the terms of this Agreement, to extract and use for domestic and agricultural purposes and for sale to third parties, water from the Servient Tenement using the Well Sites and the Water Wells installed thereon, regardless of where such water is derived.

(b)     Water Well, Water Line, Pump House and Appurtenances Easement.   The full and perfect right to pump all water and to construct and install water pipes

and pipelines, well casings, water pumps, pump controllers, pressure tanks, pump/pressure tank housing, holding tanks, and such other improvements as may to necessary to pump such water and to conduct such water from the Water Wells located on the Well Sites to the Dominant Tenement or to Wheeler Canyon Road over and across water lines to be installed by the owner of the Dominant Tenement in the Access Easement or in the area shown on **Exhibit F** hereto (collectively, the "**Appurtenances**").

   (c) <u>Electrical Easement</u>. An electrical utility easement within the Access Easement (as hereinafter defined) for purposes of providing electrical service to the Well Sites and for the operation of the Water Wells and Appurtenances.

   (d) <u>Secondary Easements</u>. The right to develop further replacement water wells on the Well Sites at such locations as the owner of the Dominant Tenement may deem appropriate in the event that the water flow from the existing Water Wells is insufficient for the purposes of the Dominant Tenement.

  1.5 <u>Access Easements</u>. Leslie hereby grants to ATC, as owner of, and for the benefit of, the Dominant Parcel a perpetual, permanent easement appurtenant to the Dominant Tenement for ingress, egress, access, electric lines, water pipelines, and other utility lines extending from Wheeler Canyon Road to each of the Well Sites, between the Well Sites, and from Wheeler Canyon Road and/or the Well Sites to the Dominant Parcel, in the area shown on **Exhibit G** hereto (the "**Access Easement**"). The owner of the Dominant Parcel shall have the right to construct (i) a bridge over Wheeler Canyon Creek, and (ii) a paved road of up to fifty (50) feet in width, to be located within the Access Easement at a location determined by the owner of the Dominant Tenement. The owner of the Servient Tenement shall have a nonexclusive right to use any such bridge and paved road for vehicular and pedestrian access from Wheeler Canyon Road to the Servient Tenement. The Access Easement shall be bordered on the south side by a fence to prevent access from the Access Easement to the Servient Tenement except through a locked gate controlled jointly by the owner of the Servient Tenement and the owner of the Dominant Parcel.

  1.6 <u>Ownership of Water Wells and Appurtenances</u>. The Water Wells, Appurtenances and electric and other utility installations shall be the property of the owner of the Dominant Parcel.

  1.7 <u>Maintenance and Repair of Water Wells and Appurtenances</u>. The owner of the Dominant Parcel shall be solely responsible for the costs of any repair to, or servicing required for, the Water Wells and the Appurtenances.

  1.8 <u>Installation of Water Meters</u>. The owner of the Dominant Parcel shall, at its sole cost, install and maintain water meters to measure the water delivered to the Servient Tenement. Such water meters shall be read at regular intervals and the owner of the Dominant Parcel shall have the right to charge the owner of the Servient Tenement for such water as set forth in <u>Article 4</u> below. The owner of the Dominant Parcel shall also be responsible at its sole cost for the installation and maintenance of such other water meters as such owner may find necessary or convenient to measure water usage by parties other than the owners of the Dominant Parcel and the Servient Tenement.

1.9   <u>Water Connection to Servient Tenement</u>.   The owner of the Dominant Parcel will, upon the later to occur of: (i) final completion of the water distribution system to the Dominant Parcel, and (ii) six (6) months' prior written notice from the owner of the Servient Tenement, connect the water distribution line from the Water Wells to the water line which as of the date hereof serves the Servient Parcel at the location shown on **Exhibit H** hereto.

2.   **Payment of Expenses**.

2.1   <u>Costs of Construction</u>.   The owner of the Dominant Parcel shall be solely responsible for paying all costs incurred in connection with the construction of the Water Wells, roads, pipelines, utilities, pumping stations and other improvements contemplated by this Agreement.

2.2   <u>Operating Costs</u>.   The owner of the Dominant Parcel shall be solely responsible for paying all costs incurred in connection with the operation and maintenance of the Water Wells, Well Sites, Access Easement and the well pumping and conveyance system, including, without limitation, supervision costs, labor and material costs for maintenance, repairs and replacements, utility costs, property taxes attributable solely to the Well Sites and the improvements thereon, and like costs.

3.   **Water Usage by Servient Tenement**

3.1   <u>Charges for Water Usage</u>.   So long as the Servient Tenement is owned by Robert G. Leslie and Marilyn B. Leslie or their direct lineal descendants, water pumped to the Servient Tenement shall be charged only an amount equal to the cost of pumping and delivering such water. Once the Servient Tenement is owned by parties other than Robert G. Leslie and Marilyn B. Leslie or their direct lineal descendants, then all water pumped to the Servient Tenement shall be charged at the market rate. Invoices not paid within thirty (30) calendar days shall bear interest from the date billed at the rate of ten percent (10%) per annum.

3.2   <u>Use of Water Limited to Servient Tenement</u>.   Water pumped to the Servient Tenement shall only be used on and for the Servient Tenement. In no event shall any such water be delivered to any off-site property or location.

3.3   <u>Reduction of Water Use</u>.   In the event that there is a period of drought or there are government-imposed restrictions on water use, and water deliveries from the Water Wells are reduced, then the water delivered to the Servient Tenement shall be comparably reduced until the drought or restriction is lifted and the Water Wells return to their non-drought capacity.

3.4   <u>Cessation of Water Use</u>.   If the charges for water pumped to the Servient Tenement are not paid when due, then the owner of the Dominant Parcel shall have the right to stop providing water to the Servient Tenement until all amounts in arrears have been paid in full, including interest at the rate set forth above.

4.   **Formation of Water Company**

4.1    Right to Form Company.  The owner of the Dominant Parcel shall have the right to form a water company to distribute and sell water from the Water Wells to third parties. The owner of the Dominant Parcel shall have the sole right to determine the form of any such company, its ownership, its operation and all other issues related to any such water company, subject only to the provisions of this Article 4.

4.2    Royalty Payment.  In the event that the owner of the Dominant Parcel forms a water company to sell water from the Water Wells to third parties, then, in consideration for the agreements set forth herein, the owner of the Servient Tenement shall be paid a royalty equal to twelve and one half percent (12.5%) of the net profits earned by any such water company. Net Profits ("Net Profits") shall mean the amount of profits remaining after (i) recoupment of all costs of installing the Water Wells and Appurtenances and improving the Well Sites and Access Easement, and (ii) recoupment of all operating and maintenance expenses, including, without limitation, debt payments, depreciation, taxes, utilities, personnel costs including full burden, licensing, utility costs, general and administrative costs, overhead, and all other operating costs.   Such royalty shall be computed annually within sixty (60) calendar days after the end of each calendar year, and the amount owed to the owner of the Servient Tenement, if any, for the previous twelve (12) month period shall be paid in twelve monthly installments on the fifteenth (15th) day of each month starting on March 15 of the first year in which payment is due for the prior twelve (12) month period.  The amount owed for the next succeeding twelve (12) month period shall be adjusted on March 15 of each year based on the annual accounting of Net Profits for the previous twelve (12) month period.

4.3    Operating Statement.  In the event that the owner of the Dominant Parcel forms a water company to sell water from the Water Wells to third parties, then, within sixty (60) calendar days after the end of each calendar year, the  owner of the Dominant Parcel shall cause the operator of the water company to prepare and distribute to the owner of the Servient Tenement an accounting showing the calculation of the royalty payment referred to in Section 4.2 hereof.

4.4    Minimum Payments.  In the event that the owner of the Dominant Parcel forms a water company to sell water from the Water Wells to third parties, in addition to the royalty payments set forth in Section 4.2 hereof,  the owner of the Servient Tenement shall be paid by the operator of  the water company monthly on the fifteenth (15th) day of each calendar month, a minimum payment equal to Twenty-Seven and no/100 Dollars ($27.00) per acre foot (the "Minimum Payment") for water pumped from the Water Wells to an offsite location during such preceding calendar month.   The Minimum Payment shall be increased annually on each anniversary of the first payment made hereunder by an amount (if any) equal to the increase in the Consumer Price Index for the Los Angeles-Orange -Riverside County area for the then-preceding calendar year.

4.5    Payment on Sale of Water Company.   The owner of the Servient Tenement shall receive twelve and one half percent (12.5%) of the net sales proceeds (after payment of all loans, commissions and costs of sale, and repayment to the owner of the Dominant Parcel of any unrecouped  costs of installing the Water Wells and Appurtenances and improving the Well Sites and Access Easement) of any sale of the interest of the owner of the

Dominant Parcel in any such water company formed to sell water pumped from the Servient Tenement.

4.6 <u>Priority of Water Use</u>. The Dominant Parcel and the Servient Tenement shall have a priority right to receive domestic and agricultural water from the Water Wells, in the event that there is not sufficient water to serve all property served by the Water Wells.

5. **Insurance and Indemnity**

5.1 <u>Insurance</u>. The owner of the Servient Tenement and the owner of the Dominant Parcel shall each maintain such policy or policies of insurance as it deems necessary, to the extent available at a reasonable cost, which policies must include, but are not limited to: (a) commercial general liability insurance in the amount of at least Two Million Dollars ($2,000,000) per occurrence, with such liability amount to be adjusted each five (5) years to the Adjusted Amount (as hereinafter defined), insuring the Parties against all liability arising out of the ownership, use or maintenance of the Well Sites and Access Easement; and (b) worker's compensation insurance, as required by law. The insurance described herein shall cover the Parties as additional insureds. Each owner shall, upon request, provide the other owner with a Certificate of Insurance or other verification as evidence that the required insurance is in effect. Each policy shall, to the extent such insurance endorsement is reasonably available, obtain for the benefit of the Parties, a waiver of any right of subrogation which the insurer of one owner may acquire against the other owner by virtue of the payment of any such loss covered by such insurance. As used herein, **"Adjusted Amount"** shall mean an amount which a prudent property owner, knowledgeable with respect to the market and free from any compulsion to act, would maintain for property comparable in location and level of improvement and condition of improvement, taking into account all then relevant factors. If the Parties cannot agree upon the Adjusted Amount, then either Party may survey three reputable property management companies with experience managing similar property in the area to determine the amount of the commercial general liability insurance policy that each such company would recommend maintaining pursuant to this Agreement. The Parties shall then average the results received and round the resulting number up to the nearest whole dollar amount that the insurer will accept as a policy amount to establish the Adjusted Amount. Notwithstanding the scope of insurance specifically set forth herein, neither owner shall be liable to any person if any risks or hazards are not covered by the insurance obtained by such Party, or if the amount of any such insurance is not adequate.

5.2 <u>Indemnity</u>. Each of the owners of the Servient Tenement and the Dominant Parcel (each referred to as **"Indemnitor"**) shall indemnify, defend and hold harmless the other and its officers, directors, managers, employees, agents, shareholders, members and partners (collectively, **"Indemnitee"**), against any and all claims, demands, costs, expenses and liabilities, including, without limitation, attorneys fees and costs (collectively, **"Claims"**) arising from the death of, or any accident, occurrence, injury, loss or damage whatsoever caused to, any natural person or to the property of any persons as shall occur during the course of entry by the Indemnitor onto the property of Indemnitee, except to the extent that such Claims are caused by Indemnitee or any contractor or invitee of Indemnitee.

6.      Waiver of Jury Trial.   TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HEREBY WAIVES ITS RIGHTS, IF ANY, TO A JURY TRIAL OF ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH A "CLAIM"). EACH OF THE PARTIES REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

IN THE EVENT ANY LEGAL PROCEEDING IS FILED IN A COURT OF THE STATE OF CALIFORNIA (THE "COURT") BY OR AGAINST ANY PARTY HERETO IN CONNECTION WITH ANY CLAIM AND THE WAIVER SET FORTH IN THIS SECTION 6 IS NOT ENFORCEABLE IN SUCH PROCEEDING, THE PARTIES HERETO AGREE AS FOLLOWS:

(i)     WITH THE EXCEPTION OF THE MATTERS SPECIFIED IN CLAUSE (ii) BELOW, ANY CLAIM SHALL BE DETERMINED BY A GENERAL REFERENCE PROCEEDING IN ACCORDANCE WITH THE PROVISIONS OF CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 THROUGH 645.1. THE PARTIES INTEND THIS GENERAL REFERENCE AGREEMENT TO BE SPECIFICALLY ENFORCEABLE.  VENUE FOR THE REFERENCE PROCEEDING SHALL BE IN THE COUNTY OF VENTURA, CALIFORNIA.

(ii)    THE FOLLOWING MATTERS SHALL NOT BE SUBJECT TO A GENERAL REFERENCE PROCEEDING: (A) NON-JUDICIAL FORECLOSURE OF ANY SECURITY INTERESTS IN REAL OR PERSONAL PROPERTY, (B) EXERCISE OF SELF-HELP REMEDIES (INCLUDING SET-OFF OR RECOUPMENT), (C) APPOINTMENT OF A RECEIVER, AND (D) TEMPORARY, PROVISIONAL, OR ANCILLARY REMEDIES (INCLUDING WRITS OF ATTACHMENT, WRITS OF POSSESSION, TEMPORARY RESTRAINING ORDERS, OR PRELIMINARY INJUNCTIONS).  THIS AGREEMENT DOES NOT LIMIT THE RIGHT OF ANY PARTY TO EXERCISE OR OPPOSE ANY OF THE RIGHTS AND REMEDIES DESCRIBED IN CLAUSES (A) - (D) AND ANY SUCH EXERCISE OR OPPOSITION DOES NOT WAIVE THE RIGHT OF ANY PARTY TO PARTICIPATE IN A REFERENCE PROCEEDING PURSUANT TO THIS AGREEMENT WITH RESPECT TO ANY OTHER MATTER.

(iii)   UPON THE WRITTEN REQUEST OF ANY PARTY, THE PARTIES SHALL SELECT A SINGLE REFEREE, WHO SHALL BE A RETIRED JUDGE OR JUSTICE.  IF THE PARTIES DO NOT AGREE UPON A REFEREE WITHIN 10 DAYS OF SUCH WRITTEN REQUEST, THEN, ANY PARTY SHALL HAVE THE RIGHT TO REQUEST THE COURT TO APPOINT A REFEREE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 640(B).

THE REFEREE SHALL BE APPOINTED TO SIT WITH ALL OF THE POWERS PROVIDED BY LAW. PENDING APPOINTMENT OF THE REFEREE, THE COURT SHALL HAVE THE POWER TO ISSUE TEMPORARY OR PROVISIONAL REMEDIES.

(iv)   EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE REFEREE SHALL DETERMINE THE MANNER IN WHICH THE REFERENCE PROCEEDING IS CONDUCTED INCLUDING THE TIME AND PLACE OF HEARINGS, THE ORDER OF PRESENTATION OF EVIDENCE, AND ALL OTHER QUESTIONS THAT ARISE WITH RESPECT TO THE COURSE OF THE REFERENCE PROCEEDING. ALL PROCEEDINGS AND HEARINGS CONDUCTED BEFORE THE REFEREE, EXCEPT FOR TRIAL, SHALL BE CONDUCTED WITHOUT A COURT REPORTER, EXCEPT WHEN ANY PARTY SO REQUESTS A COURT REPORTER AND A TRANSCRIPT IS ORDERED, A COURT REPORTER SHALL BE USED AND THE REFEREE SHALL BE PROVIDED A COURTESY COPY OF THE TRANSCRIPT. THE PARTY MAKING SUCH REQUEST SHALL HAVE THE OBLIGATION TO ARRANGE FOR AND PAY THE COSTS OF THE COURT REPORTER, PROVIDED THAT SUCH COSTS, ALONG WITH THE REFEREE'S FEES, SHALL ULTIMATELY BE BORNE BY THE PARTY WHO DOES NOT PREVAIL, AS DETERMINED BY THE REFEREE.

(v)   THE REFEREE MAY REQUIRE ONE OR MORE PREHEARING CONFERENCES. THE PARTIES HERETO SHALL BE ENTITLED TO DISCOVERY, AND THE REFEREE SHALL OVERSEE DISCOVERY IN ACCORDANCE WITH THE RULES OF DISCOVERY, AND SHALL ENFORCE ALL DISCOVERY ORDERS IN THE SAME MANNER AS ANY TRIAL COURT JUDGE IN PROCEEDINGS AT LAW IN THE STATE OF CALIFORNIA.

(vi)   THE REFEREE SHALL APPLY THE RULES OF EVIDENCE APPLICABLE TO PROCEEDINGS AT LAW IN THE STATE OF CALIFORNIA AND SHALL DETERMINE ALL ISSUES IN ACCORDANCE WITH CALIFORNIA SUBSTANTIVE AND PROCEDURAL LAW. THE REFEREE SHALL BE EMPOWERED TO ENTER EQUITABLE AS WELL AS LEGAL RELIEF AND RULE ON ANY MOTION WHICH WOULD BE AUTHORIZED IN A TRIAL, INCLUDING MOTIONS FOR DEFAULT JUDGMENT OR SUMMARY JUDGMENT. THE REFEREE SHALL REPORT HIS OR HER DECISION, WHICH REPORT SHALL ALSO INCLUDE FINDINGS OF FACT AND CONCLUSIONS OF LAW.   THE REFEREE SHALL ISSUE A DECISION AND PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE, SECTION 644, THE REFEREE'S DECISION SHALL BE ENTERED BY THE COURT AS A JUDGMENT IN THE SAME MANNER AS IF THE ACTION HAD BEEN TRIED BY THE COURT. THE FINAL JUDGMENT OR ORDER FROM ANY APPEALABLE DECISION OR ORDER ENTERED BY THE REFEREE SHALL BE FULLY APPEALABLE AS IF IT HAS BEEN ENTERED BY THE COURT.

(vii)   THE PARTIES RECOGNIZE AND AGREE THAT ALL CLAIMS RESOLVED IN A GENERAL REFERENCE PROCEEDING PURSUANT HERETO WILL BE DECIDED BY A REFEREE AND NOT BY A JURY. AFTER

CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR OWN CHOICE, EACH PARTY HERETO KNOWINGLY AND VOLUNTARILY AND FOR THEIR MUTUAL BENEFIT AGREES THAT THIS REFERENCE PROVISION SHALL APPLY TO ANY DISPUTE BETWEEN THEM THAT ARISES OUT OF OR IS RELATED TO THIS AGREEMENT.

7.     **Mutuality, Reciprocity, Runs with Land.** All restrictions, rights and easements contained herein are, to the extent specified herein, made for the direct, mutual and reciprocal benefit of each and every portion of the benefitted property; shall, to the extent specified herein, create and be enforced as mutual, equitable servitudes upon each such property in favor of the other property; shall, to the extent specified herein, create reciprocal rights and obligations among the respective owners, their heirs, successors and assigns; and shall, to the extent specified herein, operate as covenants running with the land pursuant to applicable law, including but not limited to Sections 1465, 1466 and 1468 of the Civil Code of the State of California. It is expressly acknowledged that the easements set forth herein are (i) made and entered into for the benefit of the Dominant Parcel and are a burden upon the Servient Tenement, (ii) run with each of the Servient Tenement and the Dominant Parcel, and (iii) shall be binding upon each successive owner of the Servient Tenement and the Dominant Parcel or any portion thereof, and each person having any interest derived in any manner through any owner thereof.

8.     **Miscellaneous**

8.1     <u>Release and Waiver</u>. To the extent permitted by law, the owner of the Dominant Parcel and the owner of the Servient Tenement for themselves and their successors and assigns (each, for purposes of this <u>Section 8.1</u>, a **"Claimant Owner"**) hereby: (i) releases all Liability (as defined below), and (ii) waives the right to seek recovery from the other for any Liability. As used herein, **"Invitees"** shall mean any and all invitees, guests, visitors, family members, contractors, employees, agents, representatives and other parties who enter upon or use any portion of the Servient Tenement or the Dominant Parcel with the permission, express or implied, of the Claimant Owner. As used herein, **"Liability"** shall mean, collectively, any and all Claims that are based on, arise out of, or result from any of the following:

(a) the Claimant Owner's failure to perform any of its obligations under this Agreement;

(b) the condition (be it physical, natural, artificial or otherwise) of any portion of the Servient Tenement or the Dominant Parcel not owned by the Claimant Owner; or

(c) the use by the Claimant Owner or its Invitees of any portion of the Servient Tenement or the Dominant Parcel that is not owned by the Claimant Owner, whether or not such use is within the scope of the easements granted pursuant to this Agreement.

8.2     <u>Entire Agreement; Amendment of Agreement</u>. This Agreement supersedes the Existing Agreement and from and after the date executed shall constitute the entire agreement of the Parties as to the subject matter set forth herein. This Agreement may be amended by recording with the Office of the County Recorder of Ventura County, California, a Certificate of Amendment, duly signed and acknowledged by both the then owners of the

Dominant Parcel and the Servient Tenement. The Certificate of Amendment shall set forth in full the amendment adopted.

8.3     Constructive Notice and Acceptance. Every person who now or hereafter owns or acquires any right, title or interest in or to any portion of the Dominant Parcel or the Servient Tenement is and shall be conclusively deemed to have consented and agreed to every restriction, easement and agreement now or hereafter imposed by this Agreement, whether or not any reference to this Agreement or such restriction, easement or agreement is contained in the instrument by which such person acquired an interest in said portion of the Dominant Parcel or the Servient Tenement.

8.4     Partial Invalidity. Any determination by any court of competent jurisdiction that any provision of this Agreement is invalid or unenforceable shall not affect the validity or enforceability of any of the other provisions hereof.

8.5     Changes in Circumstances. Except as otherwise expressly provided in this Agreement, no change of conditions or circumstances shall operate to extinguish, terminate or modify any of the provisions of this Agreement.

8.6     Exclusion of Warranties and Representations. Anything to the contrary in this Agreement notwithstanding, the owner of the Dominant Parcel makes no warranties or representations whatsoever that the Well Sites and Access Easement will be improved as provided herein, nor that any water company will be created or, if created, operated for any period of time or that if operated, it will generate any Net Profits.

8.7     Incorporation. Deeds to and instruments affecting any part of the Servient Tenement or the Dominant Parcel may contain the provisions herein set forth by reference to this Agreement. Regardless of whether any such reference is made in any deed or instrument, each and all of the provisions shall be binding upon the grantee or other person claiming through any instrument or any heirs, executors, administrators, successors and assigns thereof.

8.8     Usage of Terms. Wherever the context of this Agreement so requires, words used in the neuter gender shall include the masculine and feminine genders; words in the singular shall include the plural; and words in the plural shall include the singular.

8.9     Captions. All captions, titles or headings contained in this Agreement are for the purpose of reference and convenience only and are not to be deemed to limit, modify or otherwise affect any of the provisions hereof or to be used in determining the intent or context thereof.

8.10    Days. All time periods set forth in terms of "days" refer to calendar days, unless otherwise specified as business days. Whenever notice must be given, documents delivered or an act done under this Agreement on a day that is not a business day, the notice may be given, document delivered or act done on the next following business day.

8.11    Notices. All notices and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been given to and received by such recipient upon being delivered personally or upon being deposited in the United

States Mail, first class, registered or certified, return receipt requested, postage prepaid, addressed to such party at the address of such party.

8.12    Applicable Law.   This Agreement shall be subject to the laws of the State of California.

8.13    Further Cooperation.   The Parties shall cooperate with each other and execute such other and further documents as may be necessary to carry out the provisions of this Agreement.

IN WITNESS WHEREOF,  the owners of the Dominant Parcel and the Servient Tenement have entered into this Agreement as of the date set forth above.

ATC Realty Nine, Inc., a California corporation

By: _____

Its: _____

James John Follis

By: _____

Its: Vice President

Kevin Wieland

Sandra K McBeth

Sandra McBeth as Chapter 7 Trustee in Case Number  9:08-BK-11949

300685568.3                                    11

STATE OF CALIFORNIA          )
                                  ) ss

COUNTY OF SANTA BARBARA    )

On _January 11 2012,_____, before me, _Lynnette M. Silva_,
a Notary Public, personally appeared Sandra K. McBeth who proved to me on the basis
of satisfactory evidence to be the person whose name is subscribed to the within
instrument and acknowledged to me that she executed the same in her authorized
capacity, and that by her signatures on the instrument the person, or the entity upon
behalf of which the person acted, executed the instrument.

       I certify under PENALTY OF PERJURY under the laws of the State of California
that the foregoing paragraph is true and correct.

       Witness my hand and official seal.

Signature _Lynnette M. Silva_       (Seal)
                Notary Public

LYNNETTE M. SILVA
Commission # 1864838
Notary Public - California
Santa Barbara County
My Comm. Expires Jul 31, 2014

STATE OF CALIFORNIA )
) ss.
COUNTY OF _Los Angeles_ )

On _Feb. 1, 2012_, before me, _Iliana Soraya Parra_, Notary Public,

personally appeared _James John Follis_ _____, who

proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

    WITNESS my hand and official seal.

Signature _____ (Seal)

ILIANA SORAYA PARRA
Commission # 1952206
Notary Public - California
Los Angeles County
My Comm. Expires Sep 15, 2015

---

STATE OF CALIFORNIA )
) ss.
COUNTY OF _Los Angeles_ )

On _Feb 1, 2012_, before me, _Iliana Soraya Parra_, Notary Public,

personally appeared _Kevin Wieland_ _____, who

proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

    WITNESS my hand and official seal.

Signature _____ (Seal)

ILIANA SORAYA PARRA
Commission # 1952206
Notary Public - California
Los Angeles County
My Comm. Expires Sep 15, 2015

# EXHIBIT A

## Legal Description of Servient Tenement

Real property in the unincorporated area of the County of Ventura, State of California, described as follows:

PARCEL 1:

PORTION OF LOT 2 OF THE ELISEO TRACT IN RANCHO EX-MISSION OF SAN BUENAVENTURA, TRACT NO. 1, IN THE COUNTY OF VENTURA, STATE OF CALIFORNIA AS PER MAP ENTITLED "MAP OF THE ELISEO TRACT, SUBDIVIDED FOR THE VENTURA LAND AND WATER COMPANY BY GEORGE WINTER C.E. NOVEMBER 1887", RECORDED IN BOOK 3, PAGE 8 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT STATION 1, WHICH IS THE SOUTHWESTERLY CORNER OF LOT 2, OF SAID ELISEO TRACT, AND THE SOUTHEASTERLY CORNER OF LOT 1;
THENCE ALONG THE SOUTHERLY LINE OF ELISEO TRACT,

1ST: NORTH 67° 30' EAST 8.80 CHAINS TO STAKE A1, THE SOUTHEASTERLY CORNER OF LOT 2, AND THE SOUTHWESTERLY CORNER OF LOT 35;
THENCE ALONG THE DIVIDING LINE BETWEEN LOTS 2 AND 35.

2ND: NORTH 13° 10' WEST 17.02 CHAINS TO STAKE A2, ON THE BANK OF WHEELER CANYON CREEK;
THENCE ALONG THE SOUTH LINE OF LAND CONVEYED TO IRVING A. SWANSON BY DEED RECORDED IN BOOK 50, PAGE 98 OF DEEDS,

3RD: WESTERLY IN A DIRECT LINE TO STATION 6 ON THE WESTERLY BOUNDARY OF LOT 2;
THENCE ALONG THE DIVIDING LINE BETWEEN LOTS 2 AND 1,

4TH: SOUTH 10° 20' EAST 7.62 CHAINS TO STATION 5; THENCE,

5TH: SOUTH 28° 20' WEST 4.39 CHAINS TO STATION 4; THENCE,

6TH: SOUTH 55° 30' EAST 5.05 CHAINS TO STATION 3; THENCE,

7TH: SOUTH 67° 30' EAST 3.03 CHAINS TO STATION 2; THENCE,

8TH: SOUTH 22° 55' EAST 4.54 CHAINS TO STATION 1; THE POINT OF BEGINNING.

EXCEPT THE PERPETUAL AND EXCLUSIVE RIGHT TO ALL THE OILS, PETROLEUM, COAL, OIL, NAPTHA, MINERAL OR CARBON OILS, ASPHALTUM AND ALL HYDRO-CARBON SUBSTANCES AND ALL OTHER KINDRED SUBSTANCES IN, UPON, UNDER OR BENEATH SAID PREMISES, AND THE RIGHT OF BEGINNING INTO AND UPON AND OF PASSING ALONG AND OVER THE SAID PREMISES AND EVERY PART AND PARCEL THEREOF FOR THE PURPOSE OF PROSPECTING, SEARCHING, EXPLORING, MINING, DIGGING AND BORING FOR ALL THE ABOVE MENTIONED OILS AND SUBSTANCES, AS EXCEPTED AND

Exhibit A
Page 1 of 6

RESERVED BY HORACE W. CARPENTER AND RUDOLPH STEINBACH, IN THE DEED RECORDED AUGUST 28, 1883, IN BOOK 13, PAGE 111 OF DEEDS.

PARCEL 2:

THOSE PORTIONS OF LOT THREE (3) SUBDIVISION "K" AND SUBDIVISION "L" AS THE SAME ARE DESIGNATED AND DELINEATED UPON THAT CERTAIN MAP ENTITLED "MAP OF THE RANCHO EX-MISSION OF SAN BUENAVENTURA, TRACT NO. 1, IN THE COUNTY OF VENTURA, STATE OF CALIFORNIA SUBDIVIDED AFTER THE SURVEY MADE BY ED T. HARE, COUNTY SURVEYOR, VENTURA COUNTY, CALIFORNIA", AND RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF SAID VENTURA COUNTY, IN BOOK 2 OF MISCELLANEOUS RECORDS AT PAGE 103 AND PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A 2 INCH PIPE AT THE SOUTHWEST CORNER OF THAT CERTAIN PARCEL OF LAND AS CONVEYED BY THE LIMONEIRA COMPANY TO THE VENTURA LAND AND WATER COMPANY BY DEED DATED MARCH 24, 1925, AND RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF SAID VENTURA COUNTY, IN BOOK 62 OF OFFICIAL RECORDS AT PAGE 283 ET SEQ.,
THENCE ALONG THE SOUTHERLY LINE OF THE SAID LANDS OF THE VENTURA LAND AND WATER COMPANY FROM THE POINT OF BEGINNING.

1ST: NORTH 67° 49' 01" EAST 2084.02 FEET (RECORDED IN THE SAID DEED OF LIMONEIRA COMPANY TO VENTURA LAND AND 2087.43 FEET) AT 1352.45 FEET A 2 INCH IRON PIPE, AT 2084.02 FEET THE SOUTHEAST CORNER OF SAID LANDS OF THE VENTURA LAND AND WATER COMPANY;
THENCE ALONG THE EASTERLY LINE OF THE SAID LANDS OF THE VENTURA LAND AND WATER COMPANY.

2ND: NORTH 20° 24' 07" EAST 156.97 FEET TO THE SOUTHWEST CORNER OF THAT CERTAIN PARCEL OF LAND AS CONVEYED BY THE LIMONEIRA COMPANY TO THE VENTURA LAND AND WATER COMPANY BY DEED DATED DECEMBER 20, 1932, AND RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF SAID VENTURA COUNTY, IN BOOK 68, PAGE 392 OF OFFICIAL RECORDS (RECORDED IN THE SAID DEED OF LIMONEIRA COMPANY TO VENTURA LAND AND WATER COMPANY DATED DECEMBER 20, 1932, AS NORTH 21° 07' 30" EAST 154.89 FEET)
THENCE ALONG THE SOUTHERLY LINE OF THE SAID LANDS OF THE VENTURA LAND AND WATER COMPANY.

3RD: NORTH 86° 35' EAST 72.20 FEET; AT 32.20 FEET THE POINT OF INTERSECTION OF THE SAID SOUTHERLY LINE OF THE LANDS OF THE VENTURA LAND AND WATER COMPANY WITH THE WESTERLY LINE OF THAT CERTAIN PUBLIC ROAD FORTY (40) FEET WIDE KNOWN AS "ELISEO ROAD" AND DESCRIBED IN THE DEED OF LIMONEIRA COMPANY TO VENTURA COUNTY, DATED APRIL 15, 1932, AND RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF SAID VENTURA COUNTY, IN BOOK 358, PAGE 334 OF OFFICIAL RECORDS; AT 72.20 FEET THE POINT OF INTERSECTION OF THE EXTENSION OF THE SAID SOUTHERLY LINE OF THE LANDS OF THE VENTURA LAND AND WATER COMPANY WITH THE EASTERLY LINE OF THE SAID "ELISEO ROAD",
THENCE AT RIGHT ANGLES ALONG THE EASTERLY LINE OF THE SAID "ELISEO ROAD" BY THE FOLLOWING THREE COURSES AND DISTANCES,

4TH: NORTH 3° 25' WEST 372.84 FEET (RECORDED IN THE SAID DEED OF LIMONEIRA COMPANY TO VENTURA COUNTY AS SOUTH 2° 41' 30" EAST) TO THE BEGINNING OF A CURVE; THENCE,

5TH: NORTHERLY ALONG A CURVE CONCAVE TO THE EAST (HAVING A RADIUS OF 980.00 FEET AND A CENTRAL ANGLE OF 11° 29') A DISTANCE OF 196.41 FEET TO THE END OF SAID CURVE;
THENCE TANGENT TO SAID CURVE,

6TH: NORTH 8° 03' 11" EAST 117.78 FEET (RECORDED IN THE SAID DEED OF LIMONEIRA COMPANY TO VENTURA COUNTY AS SOUTH 8° 47' 30" WEST) TO A POINT; THENCE,

7TH: NORTH 85° 41' 52" EAST 273.26 FEET TO A 2 INCH IRON PIPE; THENCE,

8TH: NORTH 32° 02' 44" EAST 86.13 FEET TO A 2 INCH IRON PIPE; THENCE,

9TH: NORTH 78° 32' 17" EAST 145.41 FEET TO A 2 INCH IRON PIPE; THENCE,

10TH: SOUTH 36° 48' 44" EAST 882.44 FEET AT 511.37 FEET A 2 INCH IRON PIPE AT 882.44 FEET A 2 INCH IRON PIPE; THENCE,

11TH: SOUTH 16° 38' EAST 2071.75 FEET AT 164.50 FEET A 2 INCH IRON PIPE, AT 352.81 FEET A 2 INCH IRON PIPE, AT 726.77 FEET A 2 INCH IRON PIPE AT 1124.05 A 2 INCH IRON PIPE, AT 1503.68 FEET A 2 INCH IRON PIPE, AT 1786.15 FEET A 2 INCH IRON PIPE, AT 1825.28 FEET A POINT IN THE SOUTH BOUNDARY OF THE SAID LOT THREE (3) SUBDIVISION "K" WHICH IS THE COMMON BOUNDARY OF THE SAID LOT THREE (3) SUBDIVISION "K" AND THE SAID SUBDIVISION "L" AT 2071.75 FEET A 2 INCH IRON PIPE; THENCE,

12TH: SOUTH 81° 21' 41" WEST 261.10 FEET AT 212.35 FEET A 2 INCH IRON PIPE AT 261.10 FEET A POINT IN THE EASTERLY LINE OF THE SAID "ELISEO ROAD", THENCE ALONG THE SAID EASTERLY LINE OF THE SAID "ELISEO ROAD" BY THE FOLLOWING TWO COURSES.

13TH: SOUTH 48° 07' 11" EAST 39.85 FEET (RECORDED IN THE SAID DEED TO LIMONEIRA COMPANY TO VENTURA COUNTY AS SOUTH 47° 21' 30" EAST) TO THE BEGINNING OF A CURVE; THENCE,

14TH: SOUTHERLY ALONG A CURVE CONCAVE TO THE WEST (HAVING A RADIUS OF 520.00 FEET AND A CENTRAL ANGLE OF 49° 33') A DISTANCE OF 449.70 FEET TO THE END OF CURVE;
THENCE AT RIGHT ANGLES TO THE TANGENT TO THE CURVE,

15TH: NORTH 88° 31' 22" WEST 40.00 FEET TO A POINT IN THE WESTERLY LINE OF THE SAID "ELISEO ROAD",
THENCE AT RIGHT ANGLES ALONG THE SAID WESTERLY LINE OF THE SAID "ELISEO ROAD",

16TH: SOUTH 1° 28' 38" WEST 74.47 FEET (RECORDED IN THE SAID DEED OF LIMONEIRA COMPANY TO VENTURA COUNTY AS SOUTH 2° 11' 30" WEST) TO A POINT; THENCE,

300685568.4

17TH: NORTH 66° 36' 22" WEST 116.54 FEET TO A POINT; THENCE,

18TH: NORTH 56° 38' 33" WEST 245.41 FEET TO A POINT; THENCE,

19TH: SOUTH 87° 54' 28" WEST 60.00 FEET TO A 2 INCH IRON PIPE; THENCE,

20TH: SOUTH 48° 56' 05" WEST 815.59 FEET AT 336.71 FEET A 2 INCH IRON PIPE, AT
815.59 FEET A 2 INCH IRON PIPE; THENCE,

21ST: SOUTH 80° 05' 35" WEST 1363.34 FEET TO A 2 INCH IRON PIPE SET IN THE
WESTERLY LINE OF THE SAID SUBDIVISION "L" AND
THENCE ALONG THE SAID WESTERLY LINE OF THE SAID SUBDIVISION "L",

22ND: NORTH 30° 56' 42" WEST 1072.07 FEET TO A INCH IRON PIPE SET AT THE
CORNER COMMON TO THE SAID SUBDIVISION "L" AND THE SAID LOT THREE (3)
SUBDIVISION "K"
THENCE ALONG THE WESTERLY LINE OF THE SAID LOT THREE (3) SUBDIVISION "K",

23RD: NORTH 29° 46' 12" WEST 1333.45 FEET TO THE POINT OF BEGINNING.

EXCEPT THE PERPETUAL AND EXCLUSIVE RIGHT TO ALL THE OILS, PETROLEUM, COAL,
OIL, NAPTHA, MINERAL OR CARBON OILS, ASPHALTUM AND ALL HYDRO-CARBON
SUBSTANCES AND ALL OTHER KINDRED SUBSTANCES IN, UPON, UNDER OR BENEATH
SAID PREMISES, AND THE RIGHT OF ENTERING INTO AND UPON AND OF PASSING
ALONG AND OVER THE SAID PREMISES AND EVERY PART AND PARCEL THEREOF FOR
THE PURPOSE OF PROSPECTING, SEARCHING, EXPLORING, MINING, DIGGING AND
BORING FOR ALL THE ABOVE MENTIONED OILS AND SUBSTANCES, AS EXCEPTED AND
RESERVED BY HORACE W. CARPENTIER AND RUDOLPH STEINBACH, IN THE DEED
RECORDED NOVEMBER 09, 1883, IN BOOK 13, PAGE 312 OF DEEDS.

PARCEL 3:

THOSE PORTIONS OF SUBDIVISION "L" AND OF LOTS 1, 2 AND 3 OF SUBDIVISION "E"
OF THE RANCHO EX-MISSION OF SAN BUENAVENTURA TRACT NO. 1, IN THE COUNTY
OF VENTURA, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2, PAGE 103
OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID
COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A STAKE MARKED F.F.F AT THE MOST EASTERLY CORNER OF SAID
SUBDIVISION "L";
THENCE ALONG THE PROLONGATION OF THE SOUTHEASTERLY LINE OF SAID
SUBDIVISION "L", NORTH 54° 01' 30" EAST 4935.30 FEET, MORE OR LESS TO A POINT
IN THE SOUTHWEST LINE OF THE LAND CONVEYED TO J.N. THILLIE AND A.J. THILLIE
BY DEED RECORDED MARCH 27, 1925 IN BOOK 65, PAGE 212 OF OFFICIAL RECORDS;
THENCE ALONG THE SOUTHWESTERLY LINE OF SAID LAND LAST REFERRED TO NORTH
32° 07' 30" WEST 1147.00 FEET, MORE OR LESS TO THE MOST WESTERLY CORNER OF
SAID LAND BY J.N. THILLIE AND A.J. THILLIE;
THENCE ALONG THE NORTHWESTERLY LINE OF SAID LAND, NORTH 53° 34' EAST
1602.63 FEET TO THE MOST NORTHERLY CORNER THEREOF, BEING A POINT IN THE
SOUTHWEST LINE OF THE LAND DESCRIBED IN DEED TO WILLIAM O'HARA RECORDED
IN BOOK 112, PAGE 363 OF DEEDS;
THENCE ALONG THE SOUTHWEST LINE OF SAID LAND OF O'HARA NORTH 35° 50"
WEST 2166.52 FEET TO THE MOST WESTERLY CORNER OF SAID LAND OF O'HARA, IN

300685568.4

THE NORTHERLY LINE OF SAID LOT 1;

THENCE ALONG THE NORTHERLY LINE OF SAID LOT 1, SOUTH 78° 30' WEST 2329.80 FEET TO THE NORTHEAST CORNER OF SAID LOT 2;

THENCE ALONG THE NORTHERLY LINES OF SAID LOTS 2 AND 3, SOUTH 67° 30' WEST 4962.51 FEET, MORE OR LESS TO A POINT IN THE CENTER LINE OF ELISEO OR WHEELER CANYON ROAD, AS CONVEYED TO THE COUNTY OF VENTURA BY DEED RECORDED IN BOOK 358, PAGE 334 OF OFFICIAL RECORDS, SAID POINT BEING ON A CURVE CONCAVE TO THE NORTHWEST, HAVING A RADIUS OF 1,000.00 FEET AND A CENTRAL ANGLE OF 1° 10' 28" A RADIAL LINE AT SAID POINT BEARING SOUTH 82° 22' 58" EAST;

THENCE SOUTHERLY ALONG SAID CURVE, AN ARC DISTANCE OF 20.50 FEET;

THENCE TANGENT TO SAID CURVE, SOUTH 8° 47' 30" WEST 199.15 FEET, MORE OR LESS, TO A POINT IN THE WESTERLY PROLONGATION OF THAT CERTAIN COURSE IN DEED TO LLOYD CORPORATION, LTD., RECORDED IN BOOK 803, PAGE 3 OF OFFICIAL RECORDS RECITED THEREIN AS HAVING A BEARING AND LENGTH OF NORTH 85° 41' 52" EAST 273.26 FEET TO A ANGLE POINT IN THE NORTHERLY LINE OF SAID LAND OF LLOYD CORPORATION LTD.;

THENCE IN A GENERAL EASTERLY AND SOUTHEASTERLY DIRECTION AND ALONG THE BOUNDARY OF LAND OF SAID LLOYD CORPORATION, LTD., THE FOLLOWING COURSES AND DISTANCES,

NORTH 32° 02' 44" EAST 86.13 FEET TO A 2 INCH IRON PIPE; THENCE,

NORTH 78° 32' 17" EAST 145.41 FEET TO A 2 INCH IRON PIPE; THENCE,

SOUTH 36° 48' 44" EAST 882.44 FEET TO A 2 INCH IRON PIPE; THENCE,

SOUTH 16° 38' EAST 2071.75 FEET TO A 2 INCH IRON PIPE;

THENCE, CONTINUING SOUTH 16° 38' EAST 529.81 FEET TO A 2 INCH IRON PIPE;

THENCE SOUTH 53° 36' 30" EAST 609.53 FEET TO A 2 INCH IRON PIPE;

THENCE SOUTH 21° 34' 45" EAST 818.11 FEET TO A 2 INCH IRON PIPE;

THENCE SOUTH 85° 13' 30" EAST 577.75 FEET TO A 2 INCH IRON PIPE SET IN THE SOUTHEAST LINE OF SAID LOT L;

THENCE ALONG SAID SOUTHEAST LINE NORTH 54° 01' 30" EAST 470.26 FEET TO THE POINT OF BEGINNING.

EXCEPT THE PERPETUAL AND EXCLUSIVE RIGHT TO ALL THE OILS, PETROLEUM, COAL OIL, NAPTHA, MINERAL OR CARBON OILS, ASPHALTUM AND ALL HYDRO-CARBON SUBSTANCES AND ALL OTHER KINDRED SUBSTANCES IN, UPON, UNDER OR BENEATH SAID PREMISES, AND THE RIGHT OF ENTERING INTO AND UPON AND OF PASSING ALONG AND OVER THE SAID PREMISES AND EVERY PART AND PARCEL THEREOF FOR THE PURPOSE OF PROSPECTING, SEARCHING, EXPLORING, MINING, DIGGING AND BORING FOR ALL THE ABOVE MENTIONED OILS AND SUBSTANCES, AS EXCEPTED AND RESERVED BY HORACE W. CARPENTIER AND RUDOLPH STEINBACH, IN THE DEED RECORDED NOVEMBER 09, 1883, IN BOOK 13, PAGE 312 OF DEEDS.

Exhibit A
Page 5 of 6

PARCEL 4:

A PORTION OF SUBDIVISION "K" OF THE RANCHO EX-MISSION OF SAN BUENAVENTURA TRACT NO. 1, IN THE COUNTY OF VENTURA, STATE OF CALIFORNIA, AS THE SAME IS DESIGNATED AND DELINEATED UPON THAT CERTAIN MAP ENTITLED "MAP OF THE RANCHO EX-MISSION OF SAN BUENAVENTURA TRACT NO. 1, SUBDIVIDED AFTER THE SURVEY MADE BY ED T. HARE, COUNTY SURVEYOR, VENTURA COUNTY, CALIFORNIA", AND RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, IN BOOK 2, PAGE 103 OF MISCELLANEOUS RECORDS, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A 2 INCH IRON PIPE SET AT THE COMMON CORNER OF SUBDIVISION "K", SUBDIVISION "L" AND LOT 9 OF THE SAID RANCHO EX-MISSION OF SAN BUENAVENTURA TRACT NO. 1,
THENCE FROM SAID POINT OF BEGINNING ALONG THE EASTERLY EXTENSION OF THE SOUTHERLY BOUNDARY OF THE SAID SUBDIVISION "L",

1ST: NORTH 54° 01' 30" EAST 2026.47 FEET; AT 60.86 FEET A 2 INCH IRON PIPE; AT 542.88 FEET A 2 INCH IRON PIPE; AT 542.88 FEET TO A 2 INCH IRON PIPE, AT 995.81 FEET TO A 2 INCH IRON PIPE; AT 1802.09 FEET A 2 INCH IRON PIPE; AT 2026.47 FEET A 2 INCH IRON PIPE; THENCE,

2ND: SOUTH 35° 58' EAST 1130.68 FEET; AT 585.96 FEET A 2 INCH IRON PIPE; AT 964.03 FEET A 2 INCH IRON PIPE; AT 1130.68 FEET A 2 INCH IRON PIPE; THENCE,

3RD: SOUTH 84° 52' WEST 980.71 FEET TO A 2 INCH IRON PIPE; THENCE,

4TH: SOUTH 54° 01' 30" WEST 556.43 FEET; AT 328.17 FEET A 2 INCH IRON PIPE; AT 556.43 FEET A 2 INCH IRON PIPE; THENCE,

5TH: NORTH 80° 58' 30" WEST 888.26 FEET TO THE POINT OF BEGINNING; AT 196.79 FEET TO A 2 INCH IRON PIPE.

EXCEPT THE PERPETUAL AND EXCLUSIVE RIGHT TO ALL THE OILS, PETROLEUM, COAL OIL, NAPTHA, MINERAL OR CARBON OILS, ASPHALTUM AND ALL HYDRO-CARBON SUBSTANCES AND ALL OTHER KINDRED SUBSTANCES IN, UPON, UNDER OR BENEATH SAID PREMISES, AND THE RIGHT OF ENTERING INTO AND UPON AND OF PASSING ALONG AND OVER THE SAID PREMISES AND EVERY PART AND PARCEL THEREOF FOR THE PURPOSE OF PROSPECTING, SEARCHING, EXPLORING, MINING, DIGGING AND BORING FOR ALL THE ABOVE MENTIONED OILS AND SUBSTANCES, AS EXCEPTED AND RESERVED BY HORACE W. CARPENTIER AND RUDOLPH STEINBACH, IN THE DEED RECORDED NOVEMBER 09, 1883 IN BOOK 13, PAGE 312 OF DEEDS.

APN:

062-0-070-055
038-0-080-015
038-0-080-025

Exhibit A
Page 6 of 6

## EXHIBIT B

### Legal Description of Dominant Parcel

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA, COUNTY OF VENTURA, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PART OF LOTS 35 AND 36 AS THE SAME ARE DESIGNATED AND DELINEATED UPON THAT CERTAIN MAP ENTITLED, "MAP OF THE ELISEO TRACT, SUBDIVIDED FOR VENTURA LAND AND WATER COMPANY" AND RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF VENTURA COUNTY IN BOOK 3, PAGE 8 OF MAPS, AND PARTICULARLY DESCRIBED AS AN ENTIRETY AS FOLLOWS:

BEGINNING AT A 1 1/2-INCH IRON PIPE SET AT THE SOUTHWEST CORNER OF SAID LOT 35, FROM WHICH THE SOUTHERLY TERMINUS OF THE CENTER LINE OF THAT CERTAIN PUBLIC ROAD 40.00 FEET WIDE, LOCALLY KNOWN AS AND CALLED, "ELISEO CANON ROAD" AS DESCRIBED IN THE DEED TO VENTURA COUNTY, DATED SEPTEMBER 22, 1893, RECORDED IN BOOK 43, PAGE 67 OF DEEDS, BEARS SOUTH 67' 30' WEST 0.83 OF A CHAIN DISTANT, AND A 2-INCH IRON PIPE SET IN THE NORTH LINE OF LOT 3 OF SUBDIVISION "K" AT THE CORNER COMMON TO SUBDIVISIONS "M" AND "J" AS THE SAME ARE DESIGNATED AND DELINEATED UPON THAT CERTAIN MAP ENTITLED, "MAP OF THE RANCHO EX-MISSION OF SAN BUENAVENTURA, TRACT NO. 1, SUBDIVIDED AFTER THE SURVEY MADE BY ED. T. HARE, COUNTY SURVEYOR, VENTURA CO., CAL. SEPTEMBER 1875," AND RECORDED IN THE   OFFICE OF THE COUNTY RECORDER OF SAID COUNTY IN BOOK 2, PAGE 103 OF MISCELLANEOUS RECORDS, BEARS SOUTH 67° 45' WEST 8.30 CHAINS DISTANT; THENCE FROM SAID POINT OF BEGINNING AND ALONG THE LINE OF SAID LOT 35 BY THE FOLLOWING EIGHT COURSES AND DISTANCES,

1ST:   NORTH 10° 30' WEST 17.02 CHAINS TO A POINT; THENCE,

2ND:   NORTH 11° 20' EAST 11.32 CHAINS TO A POINT; THENCE,

3RD:   NORTH 57° 40' WEST 4.28 CHAINS TO A POINT; THENCE,

4TH:   NORTH 38° 30' EAST 7.20 CHAINS TO A POINT; THENCE,

5TH:   NORTH 22° 00' WEST 4.07 CHAINS TO A POINT; THENCE,

6TH:   NORTH 67° 40'  WEST 2.42 CHAINS TO A POINT; THENCE,

7TH:   NORTH 30° 17'  EAST 3.95 CHAINS TO A POINT; THENCE,

8TH:   NORTH 44° 28'  WEST 4.95 CHAINS TO A POINT; THENCE LEAVING THE BOUNDARY LINE AND CROSSING SAID LOT 35,

9TH:   NORTH 58° 07'  EAST 40.02 CHAINS TO A STAKE MARKED "B.1" SET IN THE BOUNDARY LINE BETWEEN SAID LOT 35 ON THE SOUTH AND LOT 34 ON THE NORTH;  THENCE ALONG SAID BOUNDARY LINE,

10TH:   NORTH 54° 45'  EAST 22.69 CHAINS TO STATION NO. 53 OF THE SURVEY OF SAID "ELISEO TRACT" IN THE WEST LINE OF THE SAID LOT 36 AT THE CORNER COMMON TO SAID LOTS 34 AND 35; THENCE ALONG THE BOUNDARY LINE BETWEEN LOT 36 ON THE EAST AND LOT 34 ON THE WEST,

11TH:   NORTH 0° 36' EAST 17.97 CHAINS TO STATION NO. 52 OF THE SURVEY OF SAID ELISEO TRACT; THENCE,

12TH:   NORTH 44° 10'  WEST 10.568 CHAINS TO A POINT, BEING THE MOST SOUTHERLY POINT OF THAT CERTAIN PARCEL OF LAND DESCRIBED IN THE DEED TO FRANK PELLISSIER, RECORDED IN

Exhibit B
Page 1 of 2

300685568.4

BOOK 59, PAGE 257 OF OFFICIAL RECORDS; THENCE LEAVING SAID BOUNDARY LINE AND CROSSING SAID LOT 36,

13TH:   NORTH 60° 01' EAST 63.80 CHAINS TO A POINT IN THE EAST LINE OF SAID LOT 36 AND IN THE WEST LINE OF LOT 2, SUBDIVISION "G" OF SAID RANCHO EX-MISSION OF SAID BUENAVENTURA, AS DELINEATED UPON THE LAST ABOVE DESCRIBED MAP, SAID POINT BEING THE MOST NORTHERLY POINT OF THAT PARCEL DESCRIBED IN THE DEED TO FRANK JAUREGUI, RECORDED IN BOOK 59, PAGE 256 OF OFFICIAL RECORDS; THENCE,

14TH:   SOUTH 16° 20' EAST 57.493 CHAINS ALONG THE EAST LINE OF SAID LOT 36 ON THE WEST AND SUBDIVISIONS "G" AND "F" OF SAID RANCHO EX-MISSION OF SAN BUENAVENTURA ON THE EAST, TO THE NORTHEAST CORNER OF THAT CERTAIN PARCEL OF LAND AS CONVEYED TO ABRAM L. HOBSON, ET AL., BY DEED DATED FEBRUARY 11, 1908, AND RECORDED IN BOOK 110, PAGE 325 OF DEEDS; THENCE ALONG THE NORTHERLY AND WESTERLY BOUNDARY LINE OF SAID LANDS OF ABRAM L. HOBSON, ET AL., BY THE FOLLOWING FOUR COURSES AND DISTANCES,

15TH:   SOUTH 71° 15' WEST 53.51 CHAINS TO STATION NO. 54 OF THE SURVEY OF SAID ELISEO TRACT IN THE BOUNDARY LINE BETWEEN SAID LOTS 36 AND 35 AND AT THE NORTHWEST CORNER OF SAID LANDS OF ABRAM L. HOBSON, ET AL.; THENCE ALONG SAID BOUNDARY LINE,

16TH:   SOUTH 0° 54' WEST 6.30 CHAINS TO STATION NO. 55 OF THE SURVEY OF SAID ELISEO TRACT; THENCE,

17TH:   SOUTH 5° 57' WEST 20.24 CHAINS TO STATION NO. 56 OF THE SURVEY OF SAID ELISEO TRACT; THENCE,

18TH:   SOUTH 42° 23' EAST 15.54 CHAINS TO A 1 1/2 INCH GALVANIZED IRON PIPE SET ON TOP OF PEAK ON RIDGE FOR STATION NO. 57 OF SAID ELISEO TRACT AT THE CORNER COMMON TO LOTS 1 AND 2 OF SUBDIVISION "K" AS DELINEATED UPON THE LAST ABOVE DESCRIBED MAP; THENCE ALONG THE BOUNDARY LINE BETWEEN SAID LOT 35 ON THE NORTH AND LOTS 2 AND 3 OF SUBDIVISION "K" ON THE SOUTH,

19TH:   SOUTH 67° 30' WEST 73.95 CHAINS TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT INTEREST AS GRANTED TO THE COUNTY OF VENTURA BY FRANK AND YSABELL JAUREGUI IN DEED RECORDED DECEMBER 8, 1932, IN BOOK 384, PAGE 447 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL PUBLIC ROADS.

ALSO EXCEPTING THEREFROM THE PERPETUAL AND EXCLUSIVE RIGHT TO ALL OIL, PETROLEUM, COAL OIL, NAPHTHA AND OTHER HYDROCARBON SUBSTANCES AND RIGHTS OF ENTRY AND RIGHTS OF WAY FOR DEVELOPING THE SAME, AND THE EXCLUSIVE RIGHT OF USING AND OCCUPYING ANY PART OF SAID LAND WHICH MAY BE REQUIRED FOR TANKS, PIPE LINES, ENGINES, DERRICKS AND OTHER MACHINERY FOR THE CONVENIENT PROSECUTION OF SAID OIL DEVELOPMENT, AND ALL OTHER RIGHTS AND EASEMENTS, AS RESERVED BY H. W. CARPENTIER AND RUDOLPH STEINBACH IN THE DEED TO PETER RICE AND ALBERT W. BROWNE, DATED JUNE 12, 1883, RECORDED IN BOOK 13, PAGE 111, OF DEEDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID VENTURA COUNTY.

APN: 062-0-050-045, 055

Exhibit B
Page 2 of 2

EXHIBIT C

Permanent Water Well Site and Water Easements

See Attached

Exhibit C

300685568.4

**EXHIBIT "C"**
Permanent Water Well Site and Water Easements

**Well # 1**

A fifty (50) foot wide by fifty (50) foot long rectangular area described as follows:

BEGINNING AT A 1 1/2-INCH IRON PIPE SET AT THE SOUTHWEST CORNER OF LOT 35 OF THAT CERTAIN MAP ENTITLED, "MAP OF THE ELISEO TRACT, SUBDIVIDED FOR VENTURA LAND AND WATER COMPANY" AND RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF VENTURA COUNTY IN BOOK 3, PAGE 8 OF MAPS; FROM WHICH THE SOUTHERLY TERMINUS OF THE CENTER LINE OF THAT CERTAIN PUBLIC ROAD 40.00 FEET WIDE, LOCALLY KNOWN AS AND CALLED, "ELISEO CANON ROAD" AS DESCRIBED IN THE DEED TO VENTURA COUNTY, DATED SEPTEMBER 22, 1893, RECORDED IN BOOK 43, PAGE 67 OF DEEDS, BEARS SOUTH 67' 30' WEST 0.83 OF A CHAIN DISTANT, AND A 2-INCH IRON PIPE SET IN THE NORTH LINE OF LOT 3 OF SUBDIVISION "K" AT THE CORNER COMMON TO SUBDIVISIONS "M" AND "J" AS THE SAME ARE DESIGNATED AND DELINEATED UPON THAT CERTAIN MAP ENTITLED, "MAP OF THE RANCHO EX-MISSION OF SAN BUENAVENTURA, TRACT NO. 1, SUBDIVIDED AFTER THE SURVEY MADE BY ED. T. HARE, COUNTY SURVEYOR, VENTURA CO., CAL. SEPTEMBER 1875," AND RECORDED IN THE   OFFICE OF THE COUNTY RECORDER OF SAID COUNTY IN BOOK 2, PAGE 103 OF MISCELLANEOUS RECORDS, BEARS SOUTH 67° 45' WEST 8.30 CHAINS DISTANT; THENCE FROM SAID POINT OF BEGINNING NORTH 67° 30' 00" EAST 2,010.88 FEET; THENCE SOUTH 22° 30' 00" EAST 1023.54 FEET TO THE TRUE POINT OF BEGINNING; THENCE NORTH 90° 00' 00" EAST 50.00 FEET; THENCE SOUTH 00° 00' 00" EAST 50.00 FEET; THENCE SOUTH 90° 00' 00" WEST 50.00 FEET; THENCE NORTH 00° 00' 00" WEST 50.00 FEET TO THE TRUE POINT OF BEGINNING.

**Well # 2**

A fifty (50) foot wide by fifty (50) foot long rectangular area described as follows:

BEGINNING AT A 1 1/2-INCH IRON PIPE SET AT THE SOUTHWEST CORNER OF LOT 35 OF THAT CERTAIN MAP ENTITLED, "MAP OF THE ELISEO TRACT, SUBDIVIDED FOR VENTURA LAND AND WATER COMPANY" AND RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF VENTURA COUNTY IN BOOK 3, PAGE 8 OF MAPS; FROM WHICH THE SOUTHERLY TERMINUS OF THE CENTER LINE OF THAT CERTAIN PUBLIC ROAD 40.00 FEET WIDE, LOCALLY KNOWN AS AND CALLED, "ELISEO CANON ROAD" AS DESCRIBED IN THE DEED TO VENTURA COUNTY, DATED SEPTEMBER 22, 1893, RECORDED IN BOOK 43, PAGE 67 OF DEEDS, BEARS SOUTH 67' 30' WEST 0.83 OF A CHAIN DISTANT, AND A 2-INCH IRON PIPE SET IN THE NORTH LINE OF LOT 3 OF SUBDIVISION "K" AT THE CORNER COMMON TO SUBDIVISIONS "M" AND "J" AS THE SAME ARE DESIGNATED AND DELINEATED UPON THAT CERTAIN MAP ENTITLED, "MAP OF THE RANCHO EX-MISSION OF SAN BUENAVENTURA, TRACT NO. 1, SUBDIVIDED AFTER THE SURVEY MADE BY ED. T. HARE, COUNTY SURVEYOR, VENTURA CO., CAL. SEPTEMBER 1875," AND RECORDED IN THE   OFFICE OF THE COUNTY RECORDER OF SAID COUNTY IN BOOK 2, PAGE 103 OF MISCELLANEOUS RECORDS, BEARS SOUTH 67° 45' WEST 8.30 CHAINS DISTANT; THENCE FROM SAID POINT OF BEGINNING NORTH 67° 30' 00" EAST 2,776.08 FEET; THENCE SOUTH 22° 30'

00" EAST 834.35 FEET TO THE TRUE POINT OF BEGINNING; THENCE NORTH 90° 00' 00" EAST 50.00 FEET; THENCE SOUTH 00° 00' 00" EAST 50.00 FEET; THENCE SOUTH 90° 00' 00" WEST 50.00 FEET; THENCE NORTH 00° 00' 00" WEST 50.00 FEET TO THE TRUE POINT OF BEGINNING.



# EXHIBIT D

## Depiction of Location of Rectangular Areas Around Water Wells

### See Attached